# In the United States Court of Federal Claims
**OFFICE OF SPECIAL MASTERS**
No. 20-1437V

|  |  |
|---|---|
| SHARI GRESS,<br><br>               Petitioner,<br>v.<br><br>SECRETARY OF HEALTH AND<br>HUMAN SERVICES,<br><br>               Respondent. | Chief Special Master Corcoran<br><br><br>Filed: December 3, 2024 |

*Brynna Gang*, Kraus Law Group, LLC, Chicago, IL, for Petitioner.

*Lynn C. Schlie*, U.S. Department of Justice, Washington, DC, for Respondent.

**RULING ON ENTITLEMENT**[1]

On October 22. 2020, Shari Gress filed a petition for compensation under the National Vaccine Injury Compensation Program, 42 U.S.C. §300aa-10, *et seq.*[2] (the "Vaccine Act"). Petitioner alleged that as a result of an influenza ("flu") vaccine she received on November 10, 2017, she suffered a shoulder injury related to vaccine administration ("SIRVA") as defined by the Vaccine Injury Table (the "Table"). Petition (ECF No. 1) at Preamble. The case was assigned to the Special Processing Unit ("SPU") of the Office of Special Masters.

---

[1] Because this ruling and decision contains a reasoned explanation for the action in this case, I am required to post it on the United States Court of Federal Claims' website in accordance with the E-Government Act of 2002. 44 U.S.C. § 3501 note (2012) (Federal Management and Promotion of Electronic Government Services). **This means this Ruling/Decision will be available to anyone with access to the internet.** In accordance with Vaccine Rule 18(b), Petitioner has 14 days to identify and move to redact medical or other information, the disclosure of which would constitute an unwarranted invasion of privacy. If, upon review, I agree that the identified material fits within this definition, I will redact such material from public access.

[2] National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755. Hereinafter, for ease of citation, all section references to the Vaccine Act will be to the pertinent subparagraph of 42 U.S.C. § 300aa (2012).

For the reasons discussed below, I find that Petitioner has carried her burden of proof in establishing that she suffered a Table SIRVA injury, and therefore is entitled to compensation.

## I. Relevant Procedural History

This claim was initiated on October 22, 2020, and relevant medical records were included with the Petition. ECF No. 1. After documentation and witness statements pertaining to the Petition were filed, the parties attempted settlement, but determined by the spring of 2022 that they could not do so. Accordingly, Petitioner filed a Motion for Ruling on the Record on May 13, 2022. ECF No. 31. Respondent reacted on June 30, 2022 (ECF No. 33), denying that entitlement was proper. A reply in support of Petitioner's claim was filed in October 2022 (ECF No. 38), and the matter is ripe for resolution.

## II. Relevant Medical History

### 1. Medical Records

On November 10, 2017, Petitioner received a flu vaccine in her left deltoid. Ex. 1 at 11. Ten days later (November 20, 2017), she had an office visit with her primary care provider (PCP), Dr. David Erickson, and she complained of sinus pain as well as left arm pain "(possibly from flu shot)". Ex. 1 at 16. Dr. Erickson noted that Petitioner had developed pain in her left "inner arm immediately after injection (the pain was not at the injection site)". *Id.* at 21. Petitioner continued to have a "throbbing" pain in upper arm but denies any warmth, numbness, redness and swelling, and had been treating the pain on her own with Ibuprofen but with no relief. *Id.*

On December 7, 2017, Petitioner contacted Dr. Erickson informing him that her pain had been "shooting down her arm into her hand". Ex. 1 at 43. She had been using lidocaine patches which were no longer providing relief. *Id.* Petitioner was diagnosed with "a nerve injury from her vaccination given time course and symptoms. Will plan to evaluate with MRI as well as EMG given worsening pain" *Id.* at 40. Petitioner was prescribed Gabapentin and recommended to stop lidocaine patches due to allergic reaction. *Id.*

On December 26, 2017, Petitioner called to coordinate care with an orthopedic office and schedule a sports medicine consult. Petitioner was concerned that her shoulder symptoms could reflect Parsonage-Turner syndrome rather than bursitis/partial rotator cuff tear seen on MRI. Ex. 1 at 49.

2

On December 27, 2017, Petitioner had an initial consultation with orthopedist Dr. David Bernard. Ex. 1 at 54. Dr. Bernard noted that Petitioner "was concerned at that time that the flu shot was given in a position that was different than usual, top of the shoulder, and felt the medicine may have been injected into her joint area. The patient then had no significant problems until 2-3 days later when she started having increasing pain in the top of the shoulder associated with loss of range of motion." Ex. 1 at 63. Dr. Bernard diagnosed Petitioner as follows: "Based on the profound weakness associated with severe pain, the timing following the flu vaccine, this most likely represents a brachial neuritis consistent with Parsonage-Turner syndrome." *Id.* at 63. Dr. Bernard recommended an EMG, but Petitioner declined due to financial constraints. *Id.* Petitioner was prescribed Gabapentin for pain control in the amount of up to 300 mg 3 times daily. *Id.*

Almost six weeks later, on February 6, 2018, Petitioner left a message for her PCP regarding increasing pain in her shoulder. Ex. 1 at 76. Petitioner was concerned that her pain was progressing from nerve pain to more of a muscle pain, and she was missing work due to her pain. *Id.*

On February 13, 2018, Petitioner returned to her PCP for her left shoulder pain. Ex. 1 at 94. Petitioner stated that she stopped the Gabapentin due to feeling it was "excessively sedating". *Id.* Petitioner's PCP then prescribed Cymbalta on February 7, 2018, however stopped using that prescription finding it was not helpful. *Id* at 98.

On February 26, 2018, Petitioner returned to Dr. Bernhardt for her continuous shoulder pain. Ex. 1 at 120. Petitioner informed Dr. Bernhardt that the Gabapentin and Duloxetine gave her feelings of fogginess and difficulty speaking. *Id.* Dr. Bernhardt noted that Petitioner "ha[d] some mild limitation in terms of range of motion." *Id.* They discussed the use of steroid injections and Petitioner was advised that if her pain was due to Parsonage-Turner Syndrome, the use of the steroid may not be effective. *Id.* Petitioner elected to proceed with the steroid injection and received her first injection that same day. *Id* at 123.

On March 7, 2018, Petitioner began physical therapy. Ex. 1 at 128. At the March 19, 2018, appointment, Petitioner informed the physical therapist that she was having improvement "in regard to pain and strength". *Id.* at 142.

On April 4 and 27, 2018, Petitioner received her second and third steroid injections in her left shoulder. Ex. 1 at 453, 457 - 458.

3

On June 22, 2018, Petitioner returned Dr. Bernhardt with complaints of "popping and crunching" in her shoulder and continued pain with reaching overhead. Ex. 1 at 176. On June 28, 2018, Petitioner received a fourth steroid injection in the left shoulder." Ex. 1 at 461.

On August 2, 2018, Petitioner had an initial appointment with an orthopedic surgeon, Dr. Andrea Spiker, for further evaluation of her left arm pain. Ex. 1 at 190. Dr. Spiker noted that Petitioner still reported "significant weakness" and had been having "trouble lifting anything more than her arm." *Id.* Dr. Spiker proposed that Petitioner's "Left shoulder pain and weakness [was] concerning for Parsonage Turner Syndrome due to significant shoulder atrophy and weakness, with pain, but maintained shoulder range of motion". *Id.* at 193.

Petitioner underwent an EMG on August 3, 2018, with normal results. Ex. 1 at 468. On August 14, 2018, Petitioner consulted with Dr. Spiker for left shoulder arthroscopy, which was performed on August 28, 2018. *Id.* at 240. During the procedure Petitioner's rotator cuff was noted to have a complete tear, and through a small hole at the junction of the supra- and infraspinatus tendons and Petitioner's subscapularis tendon was intact. *Id.* at 241.

On September 6, 2018, Petitioner had a post-surgical appointment. Ex.1 at 342. Petitioner felt pain was improving however was returning since she stopped using her medication. *Id.* Sutures were removed, reported mild fever and chills. *Id.* Petitioner was instructed to continue using the sling and to attend physical therapy, and was noted to have no "active" range of motion at the time. *Id.*

On October 11, 2018, Petitioner had an appointment with Dr. Spiker and complained of pain which was noted as being "likely related to the healing process following the subacromial decompression." Ex. 1 at 385. Petitioner was instructed to discontinue the use of the sling, continue physical therapy, and follow up again in six weeks. *Id.*

On November 9, 2018, Petitioner began post-surgical physical therapy sentence. Ex. 1 at 414. Petitioner stated that she continued to have shoulder pain that appeared to be "spreading". *Id.* The physical therapist noted that Petitioner claimed the sessions do not seem to be "helpful". *Id.*

On October 11, 2018, Petitioner had a follow up appointment with Dr. Spiker and a post-surgical x-ray.  Ex. 1 at 380, 442. She was still had complaints of pain which was noted as "likely related to the healing process following the subacromial decompression."

4

*Id* at 385. Petitioner was instructed to discontinue use of the sling, continue with physical therapy and have a follow up appointment in six weeks. *Id.*

On November 16, 2018, Petitioner had an appointment at UW Health for Pain Management. Ex. 3 at 107 – 1102. Petitioner met with Physician's Assistant, Leslie Liegel, who prescribed a home exercise program and instructed Petitioner to continue physical therapy. *Id.*

On November 27, 2018, Petitioner had a lidocaine injection in her left shoulder. Ex. 3 at 1045. As of December 2018, she began to receive weekly lidocaine injections. *See generally* Pet. Ex. 3 at 13-1000; Pet. Ex. 4 at 417-437.

On December 20, 2018, Petitioner followed up with Dr. Spiker, who noted that Petitioner had continued pain and weakness in her left arm. Ex. 3 at 958. It was recommended Petitioner have an additional MRI of the shoulder, cervical spine, and repeat EMG/NCS studies. *Id.* Petitioner requested to move forward with the MRI, however declined the EMG. *Id.*

On December 26, 2018, Petitioner had a second MRI that showed "[p]ostoperative changes of rotator cuff repair, with bursal sided partial-thickness fraying of the infraspinatus tendon, but no failure of the tendon to bone repair" and "new, moderate fatty atrophy and edema of the infraspinatus muscle." *Id.* at 938-940.

On January 24, 2019, Petitioner returned to Dr. Spiker for a follow-up appointment. Ex. 3 at 827-31. Dr. Spiker noted that Petitioner reported "significant improvement in her shoulder pain and ROM". *Id.* at 829. Dr. Spiker discussed Petitioner's MRI results and found no abnormalities. *Id.* at 830.

On March 21, 2019, Petitioner had a follow up with Dr. Spiker. Ex. 3 at 723. Petitioner informed Dr. Spiker that she felt she was "making slow progress since the last visit". However, Petitioner felt most of her limitations were around her deltoid when she lifted her arm. *Id.* at 723 – 724.

On April 23, 2019, Petitioner had a physical therapy appointment. She was assessed as to having an "acute set back" Ex. 3 at 659. It is noted that Petitioner had some improvement "in [her] left shoulder [although] internal rotation range of motion but this is still limited." *Id.* She was to return to physical therapy twice a week. *Id.*

5

On April 30, 2019, Petitioner had a routine physical with her PCP. Ex 3. at 633. It was noted that Petitioner was "slowly improving" with her shoulder pain post-surgery. *Id.* at 636.

Petitioner had an Orthopedic follow up with Dr. Spiker on August 1, 2019. Ex. 3 at 427-433.  Petitioner complained of a "catching and popping sensation" and a "loose" feeling in her shoulder. *Id.* Petitioner was to continue with lidocaine injections and physical therapy. *Id.* The use of physio tape had provided some relief, however, was stopped due to dermatitis. *Id.*

On September 10, 2019, Dr. Spiker sent Petitioner a secure message via a medical portal, that she spoke with a colleague and although the recovery was slower than expected, an additional surgery would not be recommended at this time. Ex. 3 at 300.

On October 31, 2019, Petitioner underwent an MRI and followed up with Dr. Spiker for continuing pain in her shoulder. Ex. 3 at 176. Dr. Spiker noted Petitioner's shoulder was continuing and excessively "subluxing/dislocating"." *Id.* The MRI showed "increased atrophy of the infraspinatus." *Id.* at 177. Petitioner was referred to Dr Geoff Baer for evaluation of a "possible bony stabilization repair" and to continue with PT. *Id.*

On November 12, 2019, Petitioner met with orthopedist Dr. Geoffrey Baer to establish care. Ex. 3 at 128-35. It is noted that she was having complaints of constant pain, muscle weakness, limited range of motion, "snapping", "popping", and is "exacerbated with certain positions". *Id.* 130. Dr. Baer's treatment plan was to move forward with a shoulder stabilizing procedure and a second EMG. *Id.* 132. Petitioner underwent her second EMG with normal results. *Id* at 74 – 75.

On January 3, 2020, Petitioner underwent a second left shoulder arthroscopy with anterior and posterior capsular plication. Ex. 4 at 294-95, 301-302. Dr. Baer found that Petitioner's "anterior portal again posterior laxity" was the biggest "issue" and the overall surgery went well. *Id.* at 311. Following the procedure, Petitioner completed 11 physical therapy sessions between January – June 2020.  Ex. 4 at 211 - 244.

On April 14, 2020, Petitioner had a virtual appointment (due to the Pandemic) with Dr. Baer. Ex. 4 at 140. Petitioner is noted to have "no pain" and had been continuing her home exercises. *Id.*  On June 23, 2020, Petitioner had a second follow-up appointment with Dr. Baer. *Id.* at 85. Dr. Baer noted that Petitioner reported doing well and had almost complete full range of motion. *Id.* at 87. On July 14, 2020, Petitioner had a virtual appointment with her new PCP, Dr. Erin Davis for unrelated issues, and it was noted that her left shoulder was feeling better.  Ex. 4 at 74 – 75.

6

There is a subsequent, substantial records gap, with Petitioner having no further appointments for her shoulder until February 2022 – almost nineteen months later. At that time (February 14, 2022), Petitioner placed a call to Dr. Baer reporting her shoulder pain had returned and she feared that her shoulder has "subluxed". Ex. 11 at 225. She reported taking Tylenol and Ibuprofen and requested an appointment. *Id.*

On February 17, 2022, Petitioner had an appointment with Dr. Baer for evaluation of her shoulder. *Id.* at 211. Dr. Baer noted that after the January 2020 surgery, Petitioner stated she was doing well, however the pain has started to increase over time. *Id.* Dr. Baer requested Petitioner have another MRI which was performed on March 1, 2022. Results of the MRI showed that "Left shoulder instability posteriorly and inferiorly with previous excellent result after surgical stabilization". *Id.* at 171. A third arthroscopy was discussed, and Petitioner elected to proceed with the procedure. *Id.* This procedure was performed on March 28, 2022. Ex. 11 at 22 – 139.

On April 17, 2022, Petitioner had a post-surgical follow up appointment with Dr. Baer. Ex. 12 at 218. A physical exam showed no erythema ecchymosis, and her shoulder was free of fluid. It is note that Petitioner stated she was "doing reasonably well." Wound care was discussed with Petitioner, as well as a precaution to keep her shoulder in the sling and to begin physical therapy. *Id.* Petitioner had 16 physical therapy sessions between April 12 – July 12, 2022. Ex. 12 at 9 – 56; 60 – 119; 160 – 215; Ex. 13 at 1237 – 1257.

On May 10, 2022, Dr. Baer reviewed the MRI results which showed "correct placement of the humeral head in the shoulder socket and she is 'naturally' sublexing out of sling". Ex. 12 at 141. Dr. Baer noted that the sublexing could work itself out when her strength improves. *Id.* Petitioner requested a copy of her medical records in order to proceed with a claim in the vaccine court. *Id.*

On June 19, 2022, Petitioner left a message for her physical therapist that she was having pain after she had a "restrictive blood flow treatment" and could not lift her arm "past 45 degrees." Ex. 12 at 59. At the July 5, 2022, appointment, Dr. Bear noted that Petitioner had significant amount of muscle atrophy which may contribute to raise and move shoulder without pain. On August 16, 2022, Petitioner had a follow up visit with Dr. Baer for shoulder evaluation and further pain management. Ex. 13 at 1214 – 1236. The physical exam showed "significant scapular winging" and "muscle atrophy". *Id.* An order for a new MRI was requested.

On August 19, 2022, at her physical therapy appointment, the therapist noted that Petitioner's "pain [wa]s worse, and she was getting more clicking with the pain in her

7

shoulder". Ex. 13 at 1204. Another MRI was performed on August 29, 2022. *Id.* at 1186. The results showed "deep partial-thickness loss of glenoid and articular cartilage." *Id.*

On September 7, 2022, Petitioner had an appointment to discuss both "non-operative and operative treatment options." Ex. 13 at 1136 - 1162. Petitioner was still considering surgical and non-surgical options. *Id.* A CT was ordered and showed moderate osteoarthritis, mild osseous remodeling of glenoid and mild posterior sublation of humeral head. *Id.* at 1123. Petitioner had a pre-operative appointment on September 13, 2022, where she requested to have the procedure be in patient rather than out-patient. Petitioner had her fourth procedure, a left reverse total shoulder arthroplasty, on September 20, 2022. *Id.* at 819. Dr. Grogan found that the tissue "appeared to be poor and there was a questionable tear in continuity." *Id.* at 840. At the September 29, 2022, post operative appointment, Dr. Grogan found Petitioner to be "progressing well" with her recovery. *Id.* at 789. As of July 18, 2024, all of Petitioner's medical records have been filed.

### 2. Affidavit Evidence

In her affidavit, Petitioner alleges she suffered a Table Injury, with shoulder pain beginning within 48 hours of receiving the vaccination. Petitioner's Affidavit at 1. Petitioner confirms that she has never had any prior left shoulder pain or suffered from injury prior to the vaccination. *Id.* David Gress, Petitioner's husband, also signed an affidavit affirming his wife's struggle with the function of her left arm and shoulder and how it has impacted her life. Ex. 8.

## III.   Parties' Respective Arguments

Petitioner argues that the medical records and affidavits support her claim that her shoulder pain began within the 48 hours of receiving the vaccination. ECF No. 31. The medical record, she contends, demonstrates that all applicable QAI's have been met and all elements of a Table SIRVA are established. *Id.* Respondent argues that Petitioner has failed to prove her Table SIRVA claim because she has failed to prove that her pain and reduced range of motion were limited to the shoulder in which the intramuscular vaccine was administered. Response at 12. Respondent further argues that Petitioner has not established causation-in-fact to support an off-Table claim. *Id.* at 13.

## IV.   Applicable Law

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). A special master must consider, but is not bound by, any diagnosis,

conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, this rule does not always apply. "Written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Murphy v. Sec'y of Health & Hum. Servs.*, No. 90-882V, 1991 WL 74931, *4 (Fed. Cl. Spec. Mstr. April 25, 1991), quoted with approval in decision denying review, 23 Cl. Ct. 726, 733 (1991), *aff'd per curiam*, 968 F.2d 1226 (Fed.Cir.1992)). And the Federal Circuit recently "reject[ed] as incorrect the presumption that medical records are accurate and complete as to all the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021).

The United States Court of Federal Claims has outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist. *La Londe v. Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381, 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such fact testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though

9

the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe*, 110 Fed. Cl. at 204 (citing Section 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

## V. Analysis

### I. Fact Findings – Onset and Entitlement

Pursuant to Vaccine Act Section 13(a)(1)(A), a petitioner must prove, by a preponderance of the evidence, the matters required in the petition by Vaccine Act Section 11(c)(1). In addition to requirements concerning the vaccination received, the duration and severity of petitioner's injury, and the lack of other award or settlement,[3] a petitioner must establish that he suffered an injury meeting the Table criteria, in which case causation is presumed, or an injury shown to be caused-in-fact by the vaccination she received. Section 11(c)(1)(C).

The most recent version of the Table, which can be found at 42 C.F.R. § 100.3, identifies the vaccines covered under the Program, the corresponding injuries, and the time period in which the particular injuries must occur after vaccination. Section 14(a). Pursuant to the Vaccine Injury Table, a SIRVA is compensable if it manifests within 48 hours of the administration of an influenza vaccine. 42 C.F.R. § 100.3(a)(XIV)(B). A vaccine recipient shall be considered to have suffered SIRVA if such recipient manifests all of the following:

> (i) No history of pain, inflammation, or dysfunction of the affected shoulder prior to intramuscular vaccine administration that would explain the alleged

---

[3] In summary, a petitioner must establish that she received a vaccine covered by the Program, administered either in the United States and its territories or in another geographical area but qualifying for a limited exception; suffered the residual effects of her injury for more than six months, died from her injury, or underwent a surgical intervention during an inpatient hospitalization; and has not filed a civil suit or collected an award or settlement for her injury.  *See* § 11(c)(1)(A)(B)(D)(E).

10

signs, symptoms, examination findings, and/or diagnostic studies occurring after vaccine injection;

(ii) Pain occurs within the specified time frame;

(iii) Pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered; and

(iv) No other condition or abnormality is present that would explain the patient's symptoms (*e.g.* NCS/EMG or clinical evidence of radiculopathy, brachial neuritis, mononeuropathies, or any other neuropathy).

42 C.F.R. § 100.3(c)(10).

A special master must consider, but is not bound by, any diagnosis, conclusion, judgment, test result, report, or summary concerning the nature, causation, and aggravation of petitioner's injury or illness that is contained in a medical record. Section 13(b)(1). "Medical records, in general, warrant consideration as trustworthy evidence. The records contain information supplied to or by health professionals to facilitate diagnosis and treatment of medical conditions. With proper treatment hanging in the balance, accuracy has an extra premium. These records are also generally contemporaneous to the medical events." *Cucuras v. Sec'y of Health & Hum. Servs.*, 993 F.2d 1525, 1528 (Fed. Cir. 1993).

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight. *Lowrie v. Sec'y of Health & Hum. Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005). However, the Federal Circuit has recently "reject[ed] as incorrect the presumption that medical records are always accurate and complete as to all of the patient's physical conditions." *Kirby v. Sec'y of Health & Hum. Servs.*, 997 F.3d 1378, 1383 (Fed. Cir. 2021). Medical professionals may not "accurately record everything" that they observe or may "record only a fraction of all that occurs." *Id.*

Medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling." *Camery v. Sec'y of Health & Hum. Servs.*, 42 Fed. Cl. 381 at 391 (1998) (citing *Blutstein v. Sec'y of Health & Hum. Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998). The credibility of the individual offering such testimony must also be determined. *Andreu v. Sec'y of Health & Hum. Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Hum. Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

11

A special master may find that the first symptom or manifestation of onset of an injury occurred "within the time period described in the Vaccine Injury Table even though the occurrence of such symptom or manifestation was not recorded or was incorrectly recorded as having occurred outside such period." Section 13(b)(2). "Such a finding may be made only upon demonstration by a preponderance of the evidence that the onset [of the injury] . . . did in fact occur within the time period described in the Vaccine Injury Table." *Id.*

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record." *La Londe Sec'y of Health & Hum. Servs.*, 110 Fed. Cl. 184 at 204 (2013) (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Hum. Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

### A. Factual Findings Regarding a Table SIRVA

After a review of the entire record, I find that a preponderance of the evidence supports the conclusion that Petitioner has satisfied the Qualifications and Aids to Interpretation ("QAI") requirements for a Table SIRVA.

#### 1. Petitioner has no Prior Left Shoulder Condition or Injury

The first requirement for a Table SIRVA is a lack of problems associated with the affected shoulder prior to vaccination that would explain the symptoms experienced after vaccination. 42 C.F.R. § 100.3(c)(10)(i). Here, there is no evidence that Ms. Gress suffered from left shoulder pain before her November 10, 2017 flu vaccination. To the contrary, during two evaluations in July 2017, Ms. Gress was examined without any complaint of pain and exhibited full range of motion, normal strength, and full normal sensation in her upper extremities. Ex. 2 at 463; Ex. 5 at 505. Respondent has also not made any argument suggesting he believes that Ms. Gress had a prior left shoulder condition or injury. Accordingly, Petitioner has met the first QAI requirement.

#### 2. Pain Occurs with the Specified Timeframe (Onset)

Regarding the onset of Petitioner's pain, in order to meet the definition of a Table SIRVA, a petitioner must show that she experienced the first symptom or onset within 48

hours of vaccination (42 C.F.R. § 100.3(a)(XIV)(B)) and that her pain occurred within that same 48-hour period (42 C.F.R. § 100.3(c)(10)(ii) (QAI criteria)).

All of the evidence in the record suggests that Ms. Gress exhibited her first symptoms of pain within 48 hours of receiving the flu vaccine, and Respondent has not offered any argument to the contrary. Ms. Gress first sought treatment for her left shoulder ten days after her flu shot, and the medical records from that visit reflect that "patient was given the influenza vaccine in the left deltoid area on 11/10/2017 and she developed pain in her left upper, inner arm immediately after the injection." Ex. 1 at 20-21. She again recounted pain starting on the same day of the vaccination when she first saw her orthopedist, Dr. Bernhardt. *Id.* at 63. Ms. Gress also submitted affidavits from herself and her husband, which both indicate that she began suffering left shoulder pain on the same day she received the flu vaccination. Ex. 8 at 1; Ex. 9 at 1. The medical records reflect that Ms. Gress has been consistent throughout in indicating that her pain began the day of the flu vaccination. Therefore, Petitioner has met the second QAI requirement.

### 3. Petitioner's Pain and Limited Range of Motion was Limited to her Left Shoulder

The specific language of a SIRVA injury contained in the QAI of the Vaccine Injury Table is that "pain and reduced range of motion are limited to the shoulder in which the intramuscular vaccine was administered." 42 C.F.R. § 100.3(c)(10)(iii) (QAI criteria)). Respondent argues that Petitioner has failed to meet the showing for this criteria because certain medical records indicate that Petitioner felt pain into her forearm and hand. Response at 12. Specifically, Respondent points to the following records: a visit Ms. Gress made to her PCP on December 7, 2017, in which she indicated that she had shooting pain down her arm into her forearm and hand (Ex. 2 at 43-44); a record from the same day in which she reported to her internal medicine provider, Dr. Stadmeyer, that her shoulder pain radiated down to her thumb (Ex. 1. At 39-40); a statement to Dr. Spiker eight months after vaccination that her pain occasionally radiated down her arm with a sensation of warmth in her middle finger (Ex. 1 at 186-96); a record nine months after vaccination on August 15, 2018, in which Petitioner again told Dr. Spiker that her pain radiated down her arm (*Id.* at 197-205); and on November 15, 2018, one year after vaccination, a report that her pain radiated to her forearm at Petitioner's initial pain management consultation. Ex. 3 at 1077-1102.

Although these particular records support Respondent's objections, the *totality* of evidence weighs in favor of the conclusion that Petitioner's initial, primary, and consistent source of pain was located in her left shoulder. For example, only ten days after her vaccination, Petitioner reported to her primary care provider with complaint of "pain in her left upper, inner arm immediately after the injection." Ex. 1 at 20-21. When Petitioner

13

reported to Dr. Bernhardt, a sports orthopedist, she reported that her shoulder began hurting the day of the vaccination and worsened thereafter. *Id.* at 62-63. The record is replete with other instances of Ms. Gress visiting her doctors and complaining of only shoulder pain. That there were occasions were Ms. Gress complained of the pain radiating from her shoulder down into lower parts of her arm such as her forearm or fingers does not disqualify her from a finding that her pain was *primarily* limited to her shoulder.

Admittedly, some of Petitioner's non-shoulder-specific symptoms suggested to treaters that she was suffering from a different injury. For example, Petitioner's symptoms lead her treating physicians to initially believe that she was experiencing a neurological condition, Parsonage-Turner syndrome (and if so no SIRVA could be maintained). But subsequent testing, including an EMG and multiple MRI's, concluded that no neurological condition existed and that the source of her pain was her left shoulder, which later required multiple surgical interventions. It is more likely that, given the severity levels of pain reported by Ms. Gress, that her shoulder injury waxed and waned between manageable levels of pain, in which it was localized in her shoulder, and severe levels of pain, in which the reported pain was so pervasive that she felt it from her shoulder and into lower parts of her left arm. Petitioner's MRI's also confirm that no medical abnormalities existed in her left forearm or hand, strengthening the finding that the origin of her pain was always her left shoulder.

Accordingly, the preponderance of the evidence leads me to find that Ms. Gress has met the third requirement for a table SIRVA.

#### 4. There is No Evidence of Another Condition or Abnormality

The last criterion for a Table SIRVA states that there must be no other condition or abnormality which would explain Petitioner's current symptoms. 42 C.F.R. § 100.3(c)(10)(iv). Once again, there is insufficient evidence in the record to suggest an alternative cause of Ms. Gress' left shoulder issues and Respondent does not argue that there is any evidence of another condition or abnormality. At most, Dr. Erickson at one point suspected that Petitioner's symptoms could reflect Parsonage-Turner syndrome, with another (Dr. Bernhardt) suspecting the same thing. But Petitioner's eventual EMG definitively ruled out any neurological explanation for her pain. Ex. 1 at 202. Dr. Spiker was thereafter able to confidently suggest Petitioner undergo arthroscopic shoulder surgery in order to address her symptoms. *Id.* at 23.

### B. Other Requirements for Entitlement

14

In addition to establishing a Table injury, a petitioner must also provide preponderant evidence of the additional requirements of Section 11(c). The overall record contains preponderant evidence to fulfill these additional requirements.

The record shows that Ms. Gress received a flu vaccine intramuscularly in her left shoulder on November 10, 2017. Ex. 1 at 11; *see* Section 11(c)(1)(A) (requiring receipt of a covered vaccine); Section 11(c)(1)(B)(i)(I) (requiring administration within the United States or its territories). There is no evidence that Petitioner has collected a civil award for her injury. Petition at 4; Section 11(c)(1)(E) (lack of prior civil award).

As stated above, I have found that the onset of Petitioner's left shoulder pain was within 48 hours of vaccination. *See* 42 C.F.R. § 100.3(c)(10)(ii) (setting forth this requirement). This finding also satisfies the requirement that Petitioner's first symptom or manifestation of onset occur within the time frame listed on the Vaccine Injury Table. 42 C.F.R. § 100.3(a)(XIV)(B) (listing a time frame of 48 hours for a Table SIRVA following receipt of the influenza vaccine). I have also found that Petitioner's pain and reduced range of motion was limited to her left shoulder. 42 C.F.R. § 100.3(c)(10). Finally, I find that there was no condition or abnormality that would explain Petitioner's symptoms after vaccination. *Id*. Therefore, Petitioner has satisfied all requirements for a Table SIRVA.

The last criteria which must be satisfied by Petitioner involves the duration of her SIRVA. For compensation to be awarded, the Vaccine Act requires that a petitioner suffer the residual effects of his or her left shoulder injury for more than six months or required surgical intervention. *See* Section 11(c)(1)(D)(i) (statutory six-month requirement). Starting from September 24, 2016 (48 hours after vaccination), the records undoubtedly demonstrate that Ms. Gress suffered the residual effects of her shoulder injury for more than six months. Thus, this requirement is also met.

Based upon all of the above, Petitioner has established that she suffered a Table SIRVA. Additionally, she has satisfied all other requirements for compensation. I therefore find that Petitioner is entitled to compensation in this case.

## II.  Conclusion

**In view of the evidence of record, I find Petitioner is entitled to compensation. A damages order will be entered following the issuance of this ruling to direct the parties of the next steps in resolving damages.**

**IT IS SO ORDERED.**

**s/Brian H. Corcoran**
Brian H. Corcoran
Chief Special Master